**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1197
_____

In re:  KB TOYS INC., et al.,

Debtors



ASM CAPITAL, L.P.; and ASM CAPITAL II, LLP,

Appellants
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 12-cv-00716)
District Judge: Hon. Richard G. Andrews
_____

Argued: September 24, 2013

Before: CHAGARES, VANASKIE, and SHWARTZ, <u>Circuit
Judges</u>.

(Filed: November 15, 2013)

Matthew B. McGuire, Esq. [ARGUED]
Landis, Rath & Cobb
919 Market Street
Suite 1800, P.O. Box 2087
Wilmington, DE 19899

      Counsel for Appellant

Susan F. Balaschak, Esq. [ARGUED]
Akerman Senterfitt LLP
666 Fifth Avenue
20th Floor
New York, NY 10103

John H. Knight, Esq.
Andrew C. Irgens, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

      Counsel for Appellee

_____

OPINION OF THE COURT
_____


SHWARTZ, Circuit Judge


I.

This appeal arises out of the Chapter 11 liquidation of KB Toys Inc. and affiliated entities (the "Debtors"). Pursuant to 11 U.S.C. § 502(d), the Residual Trustee of the KBTI Trust[1] sought to disallow certain trade claims that ASM Capital, L.P., and ASM Capital II, LLP, (together, "ASM") obtained from some of the creditors. Under § 502(d), a bankruptcy claim can be disallowed if a claimant receives property that is avoidable or recoverable by the bankruptcy estate. See 11 U.S.C. § 502(d). The issue here is whether a trade claim that is subject to disallowance under § 502(d) in the hands of the original claimant is similarly disallowable in the hands of a subsequent transferee. For the reasons set forth herein, the answer is yes and thus, we will affirm.

II.

A.

Creditors holding claims against an entity who has filed a Chapter 11 petition sometimes face a risky and lengthy bankruptcy process. To avoid this risk and expense, a creditor may look to sell its claim, a practice permitted under the bankruptcy rules. In re Kreisler, 546 F.3d 863, 864 (7th Cir. 2008) (citing Fed. R. Bankr. P. 3001(e)). By selling its claim, a risk averse creditor can opt out of the bankruptcy process and obtain an immediate, albeit discounted, payment on the debt it is owed. See id. Claim purchasers buy these claims and hope to receive a distribution from the debtor's estate in excess of the price paid. See Tally M. Wiener & Nicholas B. Malito, On the Nature of the Transferred

_____

[1] The Debtors' plan of reorganization established the KBTI Trust. The KBTI Trust is authorized to liquidate and collect assets for the benefit of creditors.

3

Bankruptcy Claim, 12 U. Pa. J. Bus. L. 35, 36 (2009) ("Some purchasers are simply . . . investing with an eye towards receiving a distribution on claims in cash or readily liquidated property in excess of the purchase price.").[2]

A trade claim is usually transferred via contract. If a claim is transferred before a proof of claim is filed, Federal Rule of Bankruptcy Procedure 3001(e)(1) allows a transferee to file the proof of claim. See Fed. R. Bankr. P. 3001(e)(1). If a claim is transferred after a proof of claim is filed, Rule 3001(e)(2) requires a claims transferee to file an "evidence of transfer" with the bankruptcy court. See Fed. R. Bankr. P. 3001(e)(2).

## B.[3]

The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on January 14, 2004 (the

---

[2] Other claims purchasers attempt to make a profit in more sophisticated ways. For example, in reorganizations, some purchasers seek to purchase claims from a particular class of claims with a view toward receiving equity interests in the reorganized debtor. See Michelle M. Harner, Trends in Distressed Debt Investing: An Empirical Study of Investors' Objectives, 16 Am. Bankr. Inst. L. Rev. 69, 82 (2008) (reporting that many claims purchasers invest in bankruptcy cases to pursue an exchange of debt for equity). This was not ASM's goal.

[3] ASM does not challenge any of the factual findings made by either the Bankruptcy Court or the District Court. ASM Br. at 13 ("[O]nly the legal conclusions—and not any factual findings—of the courts below are challenged.").

"Petition Date") to liquidate all of their assets. On March 15, 2004, as required by 11 U.S.C. § 521(a)(1)(B)(iii), each Debtor filed a Statement of Financial Affairs ("SOFA"). Each SOFA required the disclosure of all payments made within the 90 days immediately preceding the Petition Date. Payments made during this 90-day time period are potentially vulnerable to attack as avoidable preferences. See 11 U.S.C. § 547(b)(4)(A).

Between April 7, 2004 and May 22, 2007, ASM, which participates in the sale and purchase of bankruptcy claims nationwide, purchased the nine claims at issue in this appeal (the "Claims") via Assignment Agreements. The Claims were originally held by various trade claimants (the "Original Claimants") to whom the Debtors owed money. The Assignment Agreements underlying the transfers of four of the Claims contained a generic indemnification clause. Five did not. Each Assignment Agreement contained specific restitution provisions that dealt with risks particular to bankruptcy. These provisions shift the risk of disallowance back to the Original Claimant by requiring the Original Claimant to pay restitution to ASM if the Claim is disallowed.[4]

---

[4] The restitution provisions took one of two forms. In one set of agreements, the restitution provisions provided: "[i]n the event . . . the Claim . . . is avoided, disallowed, expunged, reduced or is otherwise subordinated . . . in whole or in part, [the Original Claimant] . . . agrees to make immediate Restitution." App. 132, 135, 270, 273. In the other set of agreements, the restitution provisions provided: "[the Original Claimant] agrees to make to [ASM] immediate proportional restitution or repayment of the above Purchase

5

Each Original Claimant was listed on a SOFA as receiving a payment within 90 days of the Petition Date. The Trustee brought preference actions[5] against the Original Claimants, eventually obtaining a judgment in each case. The judgments against the Original Claimants were uncollectable because the Original Claimants all went out of business. ASM purchased eight of the Claims before the Trustee commenced the preference actions and purchased one after the Trustee obtained a judgment.

On July 31, 2009, the Trustee filed an objection with the Bankruptcy Court seeking the disallowance of the Claims pursuant to § 502(d). The Trustee did not allege that ASM itself received an avoidable transfer. Instead, the Trustee contended that the Claims are disallowable under § 502(d)

---

Price to the extent the Claim is . . . avoided, disallowed, expunged, reduced or subordinated for any reason whatsoever in whole or in part . . . ." App. 117, 120, 123, 126, 129.

[5] To succeed in a preference action, a trustee must show that a transfer: (1) was to or for the benefit of a creditor; (2) was for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) was made while the debtor was insolvent; (4) was on or within 90 days before the filing of the bankruptcy petition; and (5) enabled the creditor to receive more than it would have in a Chapter 7 liquidation. 11 U.S.C. § 547(b). Preference actions, among other things, "facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of its class may be required to disgorge the payment so that all may share equally." 5 Collier on Bankruptcy ¶ 547.01 (16th ed. 2010).

because each Original Claimant received a preference before transferring its Claim to ASM.

After considering the language of § 502(d) and its legislative history, the Bankruptcy Court disallowed the Claims, concluding that a claims purchaser holding a trade claim is subject to the same § 502(d) challenge as the original claimant. Put differently, the Bankruptcy Court held that, under § 502(d), "[d]isabilities attach to and travel with the claim." App. 76. The Bankruptcy Court also observed that ASM is a sophisticated entity, well aware of the bankruptcy process, who had access to both the SOFA and the Original Claimants, and thus, was on "constructive notice" of the potential preference actions and could have discovered the potential for disallowance under § 502(d) with "very little due diligence." App. 88. Accordingly, the Bankruptcy Court held that ASM was not entitled to protection as a "good faith" purchaser.

ASM appealed the decision to the District Court, which affirmed the Bankruptcy Court. The District Court noted that it believed the plain language of § 502(d) was ambiguous but it otherwise adopted the reasoning of the Bankruptcy Court. ASM appealed.[6]

---

[6] We exercise plenary review of a decision of a district court sitting as an appellate court in a bankruptcy proceeding. In re Mintze, 434 F.3d 222, 227 (3d Cir. 2006). We review the Bankruptcy Court's findings of fact under the clearly erroneous standard, its conclusions of law under a de novo standard, and its exercises of discretion for abuses thereof. Id. at 227-28. The Bankruptcy Court had jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. The District Court

7

III.

A.

Section 502(d) of the Bankruptcy Code provides: Notwithstanding subsections (a) and (b) of this section, the court shall disallow *any claim of any entity* from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d) (emphasis added). The issue in this case, which only concerns trade claims, turns on the interpretation of the phrase "any claim of any entity."

The Court's analysis begins with the text of the statute. If the text is clear and unambiguous, this Court must simply apply it. Roth v. Norfalco L.L.C., 651 F.3d 367, 379 (3d Cir. 2011) ("When the meaning of statutory text is plain, our inquiry is at an end."). Yet courts must be mindful, particularly when examining the Bankruptcy Code, that statutory interpretation is "a holistic endeavor." Official

---

had appellate jurisdiction under 28 U.S.C. §§ 158(a)(1) and 1334. We have appellate jurisdiction pursuant to 28 U.S.C. §§ 158(d) and 1291.

Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery, 330 F.3d 548, 559 (3d Cir. 2003) (en banc) (quotation and citation omitted). Consequently, courts "must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." Id. (quotation and citation omitted). If the statutory text is ambiguous, a court may look to the legislative history. Blum v. Stenson, 465 U.S. 886, 896 (1984).

The language of § 502(d) states that "any claim of any entity" who received an avoidable transfer[7] shall be disallowed. Thus, the statute operates to render a category of claims disallowable—those that belonged to an entity who had received an avoidable transfer. Further, the statute provides that such claims cannot be allowed until the entity who received the avoidable transfer, or the transferee, returns it to the estate. 11 U.S.C. § 502(d) (stating that the trustee shall disallow such claims "unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable . . ."). Accordingly, "any claim" falling into this category of claims is disallowable until the avoidable transfer is returned. Because the statute focuses on claims—and not claimants—claims that are disallowable under § 502(d) must be disallowed no matter who holds them.

---

[7]A transfer of property can be avoided under one of the various avoidance sections. For example, a trustee or a debtor in possession may avoid preferential transfers under 11 U.S.C. § 547 and fraudulent transfers under 11 U.S.C. § 548.

To hold otherwise would contravene the aims of § 502(d), the first of which is to ensure equality of distribution of estate assets. Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.) (Enron II), 379 B.R. 425, 434 (S.D.N.Y. 2007); see also Cybergenics, 330 F.3d at 559 (noting that courts must look to a law's "object and policy" when interpreting the law). If a transferred claim was protected from disallowance, an original claimant who received an avoidable transfer would have an incentive to sell its claim and "wash" the claim of any disability. After all, if the original claimant did not transfer its claim, the claim would be disallowed pursuant to § 502(d). If the original claimant could transfer the claim for value to a transferee, the original claimant would receive value for a claim that would otherwise be disallowed and the transferee, who would receive the claim "washed" of its disability, could then share in the distribution of estate assets. In short, the original claimant would have an incentive to sell its claim—so it could receive some value for an otherwise valueless claim— and the transferee would have an incentive to buy the claim— because once the claim is in its hands, the claim is eligible to receive a distribution.

Allowing such a result would negatively impact the other creditors in two ways. First, because the original claimant has not returned the avoidable transfer, the estate has less money and the other creditors would receive smaller amounts from the estate because it would not include the unreturned preference payment or conveyance. Second, the estate would pay on a claim that would have been otherwise disallowed.

10

This result would also undermine the second of § 502(d)'s aims, coercing compliance with judicial orders. Enron II, 379 B.R. at 434. Section 502(d) can be used to compel an original claimant to comply with a judgment and return the preferential payment as a condition of collecting on its claim. Failure to satisfy this condition provides a basis for the trustee to ask the bankruptcy court to disallow the claim. After the claim is sold, the original claimant no longer has a claim that the trustee can leverage to obtain the disgorgement of the preference payment. To allow the sale to wash the claim entirely of the cloud would deprive the trustee of one of the tools the Bankruptcy Code gives trustees to collect assets—asking the bankruptcy court to disallow problematic claims. Accordingly, interpreting § 502(d) to permit this type of "claim washing" would undermine the twin aims of § 502(d).[8]   For all of these reasons, the statute's language is

---

[8] At oral argument before our Court and the District Court, an important policy consideration was raised, which further supports this interpretation: who should bear the risk that avoidable transfers are not returned? The answer must be the claim purchaser for two reasons. First, claim purchasers voluntarily choose to take part in the bankruptcy process. Claim purchasers, who are typically sophisticated entities, "are aware of, or should be aware of, the risks and uncertainties" in the bankruptcy process. Enron Corp. v. Avenue Special Situations Fund II, LP (In re Enron Corp.) (Enron I), 340 B.R. 180, 202 (Bankr. S.D.N.Y. 2006), vacated and remanded by Enron II, 379 B.R. 425, 434 (S.D.N.Y. 2007). Because they choose to voluntarily take part in this risky process, it is only fair to require them to bear the risk that the original claimant will not return an avoidable transfer. Second, claim purchasers are in a position to mitigate

11

properly interpreted to mean that the potential disallowance runs with the claim.

Moreover, the legislative history supports this conclusion. The legislative history provides that § 502(d) is "derived from present law," which, as the Bankruptcy Court noted, was section 57(g) of the Bankruptcy Act of 1898.[9] H.R. Rep. 95-595, at 354 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6310. Section 57(g) provided:

---

disallowance risk, whereas the other creditors are not. A claim purchaser can perform due diligence on the original claimant and estimate the risk of disallowance. The claim purchaser can then account for this risk when determining the price to pay for a claim. Additionally, a claim purchaser may shift the risk of disallowance back to the original claimant through an indemnity clause in the transfer agreement.

[9] Even if the legislative history were not so clear, we would still consider section 57(g) because courts are "reluctant to accept arguments that would interpret the [Bankruptcy] Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history." Dewsnup v. Timm, 502 U.S. 410, 419 (1992). Indeed, other courts have recognized that section 57(g) is relevant to the interpretation of § 502(d). See In re LaRoche Indus., Inc., 284 B.R. 406, 409 (Bankr. D. Del. 2002) (examining a case interpreting section 57(g) when faced with an issue arising under § 502(d)); In re America's Shopping Channel, Inc., 110 B.R. 5, 7-8 (Bankr. S.D. Cal. 1990) (same); In re Mid Atl. Fund, Inc., 60 B.R. 604, 610 (Bankr. S.D.N.Y. 1986) (same).

> The claims of creditors who have received or acquired preferences, liens, conveyances, transfers, assignments or encumbrances, void or voidable under this title, shall not be allowed unless such creditors shall surrender such preferences, liens, conveyances, transfers, assignments, or encumbrances.

Katchen v. Landy, 382 U.S. 323, 473 n.5 (1966) (quoting section 57(g)).

In Swarts v. Siegel, 117 F. 13 (8th Cir. 1902), the Court of Appeals for the Eighth Circuit interpreted section 57(g) as it applied to a claimant who purchased promissory notes from a bank that received a preference. 117 F. at 14. The Swarts court held that the "[t]he disqualification of a claim for allowance created by a preference inheres in and follows every part of the claim, whether retained by the original creditor or transferred to another, until the preference is surrendered." Id. at 15. Thus, the case law interpreting section 57(g) is consistent with our interpretation of § 502(d).[10]

---

[10] In an attempt to distinguish Swarts, ASM cites to In re Wood & Locker, Inc., 1988 U.S. Dist. LEXIS 19501 (W.D. Tex. June 17, 1988). The Wood & Locker court held that Swarts was only applicable to cases where the original claimant or a transferee received "provable and traceable direct benefits by the payment of the preferences." Id. at *8. ASM contends that since it did not receive a provable and traceable direct benefit from the preference payment, it should not be saddled with paying the preference. Appellant Br. at 22. Neither ASM nor the Wood & Locker court,

Finally, because ASM included provisions in the Assignment Agreements that directly deal with risks particular to bankruptcy, it is evident that ASM was aware that disallowance could potentially attach to, and travel with, the Claims. Thus, ASM's conduct when negotiating and entering into the Assignment Agreements is consistent with our interpretation of § 502(d).

In short, because § 502(d) permits the disallowance of a claim that was originally owned by a person or entity who received a voidable preference that remains unreturned, the cloud on the claim continues until the preference payment is returned, regardless of whether the person or entity holding the claim received the preference payment.[11]

---

however, explain why § 502(d) requires proof of a traceable direct benefit to the entity who possesses the claim. Instead, they both make this assertion without analysis of the statutory text. Once the text is analyzed, it is clear that the plain language of § 502(d) does not require proof of a benefit from the avoidable transfer. Thus, ASM's lack of a benefit from the preferences is irrelevant to the question before the Court.

[11] In addition to the Bankruptcy Court in this case, two other bankruptcy courts have reached the same conclusion: Enron I, 340 B.R. at 199 (holding that a claim in the hands of a transferee "should be disallowed to the same extent that such claim would be subject to disallowance in the hands of the transferor"), and In re Metiom, Inc., 301 B.R. 634, 642-43 (Bankr. S.D.N.Y. 2003) (holding that because § 502(d) "disallows *the claim* . . . [t]he claim and the defense to the claim under [§] 502(d) cannot be altered by the claimant's subsequent assignment of the claim to another entity . . . that has not received an avoidable transfer.").

Two district courts have reached opposite conclusions. In <u>Enron II</u>, the District Court viewed the language of § 502(d) as focusing "on the claimant as opposed to the claim" and this led it to "conclu[de] that disallowance is a personal disability of a claimant, not an attribute of the claim." 379 B.R. at 443. It then proceeded to rely on state law to determine the impact of this "personal disability" and concluded that whether a claim suffered a disability depended upon how it was conveyed to the transferee. Specifically, the District Court held that disallowance under § 502(d) is a personal disability of particular claimants and not an attribute of a claim, unless the transferee took the claim by assignment, as opposed to by sale. <u>Enron II</u>, 379 B.R. at 439-45. The District Court stated that an assignee "stands in the shoes of the assignor" and therefore takes the claim with "whatever limitations it had in the hands of the assignor," <u>id.</u> at 435-36 (citations and internal quotations omitted), but a purchaser of the same claim is not subject to any personal disabilities of the transferor. <u>Id.</u> at 436.

<u>Enron II</u>'s reliance on this supposed state law distinction may also be problematic for several reasons. First, the state law on which it relies does not provide a distinction between assignments and sales. Second, resort to state law in a bankruptcy case must be done with care. <u>See</u> <u>Int'l Shoe Co. v. Pinkus</u>, 278 U.S. 261, 265 (1929) ("The power of Congress to establish uniform laws on the subject of bankruptcies throughout the United States is unrestricted and paramount."); <u>In re Boston Reg'l Med. Ctr., Inc.</u>, 291 F.3d 111, 126 (1st Cir. 2002) (observing that if a state law dictated a result inconsistent with federal bankruptcy law, then it would be "preempted").

15

## B.

ASM also argues that the claims should not be disallowed because it purchased its claims in "good faith" and is therefore entitled to the protections of a good faith purchaser under 11 U.S.C. § 550(b). Section 550(b) provides:

> The trustee may not recover under section (a)(2) of this section from--
> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
> (2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(b). An application of the plain language of the statue to the facts of this case shows that ASM is not entitled to a defense under § 550(b).

First, § 550(b) is not applicable to ASM. Section 550(b) protects a good faith transferee who purchases property of the estate that is avoidable under the various avoidance sections. 11 U.S.C. § 550(a), (b); see Wasserman v. Bressman, 327 F.3d 229, 235 (3d Cir. 2003). ASM did not purchase property of the estate. ASM purchased *claims* against the Debtors' estates. A claim against an estate is not property of that estate. Enron I, 340 B.R. at 206 ("[A] claim as defined under [§] 101(5), is not, and has never been, considered property of the estate (it is being asserted against) under [§] 541 of the Bankruptcy Code."). Thus, on its face, § 550(b) is inapplicable to ASM.

16

Second, there is no reason or precedent to extend the "principles" of § 550(b) to protect ASM. Claim purchasers are entities who knowingly and voluntarily enter the bankruptcy process. Thus, a purchaser should know that it is taking on the risks and uncertainties attendant to the bankruptcy process. Indeed, if the bankruptcy process were not risky and uncertain, claimants might be less likely to sell their claims to a claim purchaser. Put differently, a claim purchaser's opportunity to profit is partly created by the risks inherent in bankruptcy. Disallowance of a claim pursuant to § 502(d) is among these risks.

Relatedly, while ASM claims it lacked knowledge of the avoidablity of the transfers, ASM could have protected itself from the risk of disallowance by reviewing the Debtors' publicly available SOFAs, which would have put it on notice of the Claims' vulnerability to preference attacks, and performing due diligence on the Original Claimants. At bottom, ASM voluntarily exposed itself to a risk that it had the ability to investigate before acquiring the claims. Conscious of this risk, it included indemnity and restitution provisions in the Assignment Agreements. ASM is in a better position than the estate to protect itself against the Original Claimants going out of business by factoring this possibility in to the price of the claim. Accordingly, in this case, extending § 550(b)'s "principles" beyond the plain statutory language is inappropriate.

IV.

For all of these reasons, we will affirm.

17