**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2522
_____

In re: ARCTIC GLACIER INTERNATIONAL, INC., et al.
Debtors in a Foreign Proceeding

ELDAR BRODSKI ZARDINOVSKY, a/k/a Eldar Brodski,
a/k/a Eldar Brodski (Zardinovsky); EB BOOKS, INC;
EB DESIGN, INC; EB ONLINE, INC; EB IMPORTS, INC;
LAZDAR, INC; ELDAR BRODSKI, INC; Y CAPITAL
ADVISORS, INC; VALLEY WEST REALTY INC;
RUBEN BRODSKI; RUBEN BRODSKI, INC;
ESTER BRODSKI; YEHONATHAN BRODSKI,
Appellants

v.

ARCTIC GLACIER INCOME FUND; JAMES E. CLARK;
GARY A. FILMON; DAVID R. SWAINE;
HUGH A. ADAMS
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1:16-cv-00617)
District Judge: Honorable Sue L. Robinson
_____

Argued March 22, 2018

Before: SMITH, *Chief Judge*, and HARDIMAN and BIBAS,
*Circuit Judges*

(Filed: August 20, 2018 )
_____

David B. Gordon, Esq. [ARGUED]
Mitchell Silberberg & Knupp
437 Madison Avenue
25th Floor
New York, NY 10022
        *Counsel for Appellants*

Autumn H. Patterson, Esq.
Mark W. Rasmussen, Esq. [ARGUED]
David R. Woodcock, Esq.
Jones Day
2727 North Harwood Street
Dallas, TX 75201

Marcos A. Ramos, Esq.
Brendan J. Schlauch, Esq.
Richards Layton & Finger
920 North King Street
One Rodney Square
Wilmington, DE 19801
        *Counsel for Appellees*

——————————

OPINION OF THE COURT

——————————

BIBAS, *Circuit Judge.*

Buying shares in a bankrupt company can be perilous business. Here, shareholders were on notice of Arctic Glacier's bankruptcy proceedings, were represented throughout those proceedings, and voted overwhelmingly to confirm the company's reorganization Plan. So their shares were subject to its benefits (its dividend-distribution scheme) as well as its burdens (its implementation particulars and releases of claims relating to the Plan). When appellants, the Brodskis, bought their shares from those shareholders, they stepped into their shoes. So the Brodskis bought shares subject to the Plan's terms, including the terms that governed post-confirmation acts taken to carry out the Plan.

The Brodskis argue that the Plan's releases of liability do not apply to them because they are not transferees and because due process forbids releasing their claims. But the Plan came along with the shares, and the Brodskis were on notice. So we will hold them, like all buyers, to the terms of their bargain.

**I.**

On review of this motion to dismiss, we take as true the factual allegations in the complaint: Arctic Glacier Income Fund is a Canadian income trust. It owns a company that manufactures and distributes packaged ice across Canada and the

3

United States. In 2012, after a rough patch, Arctic Glacier filed for bankruptcy under the Companies Creditors' Arrangement Act, Canada's analogue of Chapter 11 of our Bankruptcy Code. Because Arctic Glacier operates in both countries, it filed for and received recognition under Chapter 15. That recognition granted the Canadian reorganization Plan (in Canada, an "arrangement") full effect in the United States. *See* 11 U.S.C. § 1521(a).

Under the Plan, Arctic Glacier was to sell its assets and distribute the proceeds to a list of creditors, giving lowest priority to shareholders (technically, "unitholders" in the trust). The Plan imposed few limits on the discretion of the Monitor (the Canadian analogue of a trustee) to sell and distribute assets, and even fewer limits on when or how much the Monitor could distribute to shareholders. But the Plan required that the Monitor give 21 days' notice of any distribution.

The Plan also included broad releases of liability. The releases insulated Arctic Glacier and its officers from any claim "in any way related to, or arising out of or in connection with" the bankruptcy. App. 248 (§ 9.1). The only exceptions were for claims to enforce the Plan, those for gross negligence or willful misconduct, and those whose release was not "permitted by applicable law." *Id.*; App. 546.

The Monitor sold Arctic Glacier's assets and repaid the creditors in full. From the remaining funds, the Monitor was set to distribute dividends to the shareholders. On December 11, 2014, Arctic Glacier published legal notices announcing that the shareholders as of December 18 would be "entitled to receive the initial distribution from [Arctic Glacier] pursuant

4

to the Plan." App. 628, 630. Four days later, Arctic Glacier announced the same information in a press release. It also posted that information on the Monitor's website and on Canada's database of corporate disclosures.

None of these notices specified how much Arctic Glacier would distribute or when. And Arctic Glacier did not notify the Financial Industry Regulatory Authority (FINRA) of its planned distribution. (FINRA is a self-regulatory organization charged by the Securities and Exchange Commission with regulating distributions on, and publishing corporate disclosures for, the U.S. Over-the-Counter Market.) Nor did the Plan incorporate, or even refer to, FINRA's rules.

Central to FINRA's rules is its distinction among dates. The "record date" determines who is *entitled to receive* the dividend from the company. FINRA, *Uniform Practice Code* § 11120(f) (2010). The issuing company must send the dividend payment to the shareholders of record as of that date. *Id.* The "ex-date" or "ex-dividend date" is the date on which the right to *retain* the dividend no longer travels with the share from the seller to the buyer. *Id.* §§ 11120(d), 11140. The owner of the share immediately before the ex-date is the one "entitled to retain the dividend." *Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 732 F.2d 859, 861 (11th Cir. 1984). If the shareholder sells a share after the record date but before the ex-date, the seller will receive the dividend from the company but must send that amount to the buyer. *Id.*; *In re Arctic Glacier Int'l, Inc.*, 255 F. Supp. 3d 534, 542 (D. Del. 2017) (citing *Silco, Inc. v. United States*, 779 F.2d 282, 284 (5th Cir. 1986) (per curiam)). Finally, the "payable date" is the date on which

the company *disburses* the dividend. *See* FINRA, *Uniform Practice Code* § 11140(b)(2).

Those distinctions matter. FINRA treats dividends worth less than 25% of a share's value differently from those worth more, setting different ex-dates for each. *Id.* § 11140(b). By contrast, the Plan spoke of a "Unitholder Distribution Record Date" and a "Unitholder Record Date." App. 231 (§ 1.1). It never mentioned an ex-date or a payable date, but instead used "Distribution Date" and "Plan Implementation Date." App. 227, 229, 240 (§§ 1.1, 6.2). And it never distinguished between dividends worth more than 25% of a share's value and those worth less, eliding FINRA's distinction.

The Plan also elided FINRA's distinction between record dates and ex-dates. The Plan provided that "Registered Unitholder[s]" not only receive "transfer[s]," but are also "entitled to the benefits of a distribution." App. 230, 240 (§§ 1.1, 6.2). Those provisions did not use FINRA's distinction between shareholders entitled to receive a dividend and shareholders entitled to retain them. App. 230 (§ 1.1).

Despite Arctic Glacier's announcements about the distribution, its share price held steady until January 22, 2015. Arctic Glacier noticed this stasis and found it puzzling, as its shares no longer traded with the right to the dividend and should have lost value equal to the dividend. But Arctic Glacier did nothing to respond to the stasis or to clarify who would be entitled to the dividend and when.

Between December 16 and January 22, the Brodskis bought more than 12,600,000 Arctic Glacier shares on the Over-the-

6

Counter Market. On January 21, the Monitor announced that the next day it would distribute a dividend of 15.5557 cents per share to shareholders as of December 18. The Monitor never told FINRA that it planned to pay the dividend. So FINRA never specified who would be entitled to the dividend and never circulated information about it.

Because the dividend payment per share was roughly 75% of the share price, the Brodskis argue, FINRA would have set an ex-date of January 23, 2015, the day after the distribution. So under FINRA's rules, the shares that the Brodskis had bought over the previous five weeks would have entitled them to the dividend. But Arctic Glacier did not follow FINRA's rules and did not pay the dividend to the Brodskis. On January 23, Canadian and American regulators froze trading in Arctic Glacier's shares. When they let trading resume, the share price plunged from 21 to 5 cents, reflecting the value of the paid-out dividend.

The Brodskis sued Arctic Glacier and four of its officers, claiming that Arctic Glacier owed them the dividend but never paid them. Count 1 of their complaint asserts that the defendants negligently failed to pay the Brodskis the dividend under the Plan. Count 2 asserts that they negligently, without FINRA's approval, specified that shareholders as of December 18 would be entitled to dividends. Count 3 asserts that the officers breached a fiduciary duty they owed to the Brodskis. Count 4 asserts that Arctic Glacier negligently failed to disclose material information. And Counts 5 and 6 assert that, by not disclosing this information, Arctic Glacier committed securities fraud and common-law fraud.

The Bankruptcy Court dismissed the complaint, holding that both the releases and res judicata barred the suit. The District Court affirmed for the same reasons. We review the Bankruptcy Court's and District Court's legal determinations de novo. *In re Makowka*, 754 F.3d 143, 147 (3d Cir. 2014).

## II.

The Brodskis' claims rest on nonbankruptcy law: The officers allegedly violated their fiduciary duty, Arctic Glacier allegedly deceived the Brodskis, and both the company and its officers were allegedly negligent in setting the ex-date and not paying the Brodskis. But the releases bar all these claims.

### A. Confirmed plans are res judicata, and *Holywell* is not to the contrary.

First, the Brodskis argue that a plan can never insulate a debtor from liability for post-confirmation acts. We reject this argument.

When a bankruptcy court enters a confirmation order, it renders a final judgment. 8 *Collier on Bankruptcy* ¶ 1141.01[4], at 1141-11 (Richard Levin & Henry J. Sommer eds., 16th ed. 2017). That judgment, like any other judgment, is res judicata. *Id.* It bars all challenges to the plan that could have been raised. Challengers must instead raise any issues beforehand by objecting to confirmation. *Id.* A plan's preclusive effect is a principle that anchors bankruptcy law: "[A] confirmation order is *res judicata* as to all issues decided or which could have been decided at the hearing on confirmation." *Donaldson v. Bernstein*, 104 F.3d 547, 554 (3d Cir. 1997) (quoting *In re Szostek*, 886 F.2d 1405, 1408 (3d Cir. 1989)); *see also Travelers Indem.*

*Co. v. Bailey*, 557 U.S. 137, 152 (2009). Thus, the entire Plan is res judicata, including its releases.

Seeking to skate around the Plan's releases, the Brodskis claim that the Plan cannot bar liability for post-confirmation acts. They rely on *Holywell Corp. v. Smith*, quoting a single sentence from the end of the opinion: "[W]e do not see how [a confirmed plan] can bind the United States or any other creditor with respect to post[-]confirmation claims." 503 U.S. 47, 58 (1992). The Brodskis interpret this lone sentence as holding that bankruptcy plans can never bar liability for any post-confirmation acts. (They also treat *Holywell* and other Chapter 11 doctrines as applicable to this Chapter 15 recognition proceeding. That may well be right, but we need not resolve the issue. We assume the same without deciding so.)

*Holywell* laid down no such broad rule. In that case, a Chapter 11 plan set up a trust and appointed a trustee to oversee the liquidation of the debtors' property. "The plan said nothing about whether the trustee had to file income tax returns or pay any income tax due." *Id.* at 51. Yet the trustee claimed that the United States, a creditor, should have objected to the plan's confirmation if it wished to preserve its right to collect taxes on the income generated by the liquidation. *Id.* at 58. In rejecting that argument, the Supreme Court noted that the tax liability arose after confirmation. *Id.* Unlike the Brodskis here, the government in *Holywell* did not directly challenge how the trustee implemented the plan.

*Holywell* cannot bear the weight that the Brodskis put on it. Its facts, its language, and its logic do not apply to post-confirmation acts that carry out a bankruptcy plan. By definition, a

9

debtor can implement its plan only after the bankruptcy court confirms it. And a confirmed plan is a binding plan. So the Brodskis' overreading of a single sentence in *Holywell* would nullify the res judicata effect of confirmed plans and, with it, much of Chapter 11. We do not read *Holywell* that broadly. It casts no doubt on the rule that confirmed plans can bar liability for post-confirmation acts.

This is not to say that a plan's preemptive scope can be unlimited. The Code authorizes preemption of laws related to financial condition, but preemption beyond that line is suspect. *See* 11 U.S.C. § 1142(a) (providing that plan implementation preempts "any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition"). *Compare In re Federal-Mogul Global Inc.*, 684 F.3d 355, 381-82 (3d Cir. 2012) (holding that, under 11 U.S.C. § 1123(a), the preemptive scope of a plan's contents can extend beyond financial condition, but noting that its preemptive "scope is not unbounded" and warrants scrutiny), *with PG&E v. California ex rel. Cal. Dep't of Toxic Substances Control*, 350 F.3d 932, 937 (9th Cir. 2003) (holding that a plan cannot preempt nonbankruptcy laws unrelated to financial condition). We need not wade into these waters, though, because the Brodskis have not preserved any objection to the scope of the Plan's preemption.

In sum, a confirmation order is a final judgment that bars later challenges to the plan. And *Holywell* does not bar plan terms authorizing or limiting liability for post-confirmation acts that implement the plan. So here, the Plan's terms control.

## B. The Plan did not require paying the Brodskis.

Nothing in the Plan required paying the Brodskis. Instead, they claim that Arctic Glacier could have harmonized the Plan with FINRA by following both sets of rules. But the Plan neither incorporated FINRA's rules nor contemplated them in its structure. And its provisions, even when consistent with FINRA, did not so much as refer to or draw on FINRA's regulatory scheme. So if FINRA's rules imposed obligations on Arctic Glacier, those obligations did not arise from the Plan. And suits to redress FINRA violations must overcome the Plan's releases of liability.

## C. The releases bar the Brodskis' claims.

The Plan's releases were res judicata as to the initial shareholders. The Plan, including its releases, came along with the shares that the Brodskis bought from those shareholders. And the Plan, including its releases, carried the same res judicata effect. So any nonbankruptcy claims based on the Brodskis' ownership are subject to the Plan and must overcome its releases. They do not.

The releases waived liability for Arctic Glacier and its officers. App. 247-48. And they extended to all claims arising out of the bankruptcy, including distributions under the Plan. *Id.* The only exceptions were for suits brought to enforce the Plan, suits alleging gross negligence or willful misconduct, and suits whose release would conflict with other "applicable law." *Id.*; App. 546 (¶14).

The Brodskis have not asserted gross negligence or willful misconduct. Nor have they claimed that the releases conflict

11

with otherwise applicable law. In particular, they have never argued that FINRA's rules qualify as "applicable law" and so survive the releases to trump the Plan's distribution rules. They did not preserve that argument in the Bankruptcy Court, in the District Court, or in this Court. So we need not address how broadly a plan can sweep when it purports to preempt otherwise applicable laws.

Instead of arguing that the releases do not cover their claims, the Brodskis attack the releases on two fronts. First, the Brodskis claim that they are not subject to the releases because buying shares of stock did not make them transferees. Second, they claim that the Due Process Clause forbids applying the releases to them. Neither claim succeeds.

1. *Buyers are transferees*. To state the first argument is to refute it. Buying a share of stock is a transfer. The buyer is a transferee. *Transferee*, in *Black's Law Dictionary* 1727 (10th ed. 2014) ("One to whom a property interest is conveyed."). The share comes with both the Plan's benefits and its burdens. So the Brodskis were transferees and took the shares with all their associated benefits and burdens, including the releases.

As our Court has explained, a claim in bankruptcy may be transferred. *In re KB Toys Inc.*, 736 F.3d 247, 249 (3d Cir. 2013). When it is, the transferee assumes the same limitations as the transferor. *Id.* at 251-52. Otherwise, buyers could revive disallowed claims, laundering them to receive better treatment in new hands. *Id.* at 252. The same holds for shares.

Nor can the Brodskis claim that they were not represented and could not have objected to the Plan. The shareholders who sold to them were represented. And when the Brodskis bought the shares, they were on notice of the Plan that came with them.

2. *Due process does not limit plans' effects on those who had notice and representation.* For similar reasons, the Brodskis' due-process claim fails. They rely on our decision in *Jones v. Chemetron Corp.*, 212 F.3d 199 (3d Cir. 2000). But that case is inapposite.

In *Chemetron*, one plaintiff was not yet born when Chemetron dumped radioactive rubble. 212 F.3d at 202, 209. That plaintiff was not represented in the bankruptcy reorganization. And Chemetron's bankruptcy plan did not set up a trust to pay future claims. *Id.* at 210. So, this Court held, his claim was not discharged in bankruptcy. *Id. Chemetron* thus holds that due process requires giving claimants notice or representation before discharging their claims in bankruptcy. *See also Wright v. Owens Corning*, 679 F.3d 101, 107-09 (3d Cir. 2012); *In re Amatex Corp.*, 755 F.2d 1034, 1042-43 (3d Cir. 1985).

*Chemetron* is not a case about buyers and sellers transferring shares and the plan that travels with them. Nor does *Chemetron* extend the Due Process Clause to buyers who had notice by publication and representation by their sellers but wish to undo the terms of their bargain. So the Brodskis, like the sellers from whom they bought, are subject to the releases. And the Brodskis do not dispute that the language of the releases bars their claims.

13

\* \* \* \* \*

The Brodskis bought shares in a bankrupt company. They had notice of that bankruptcy and knew how the Plan bore on their purchase. And they bought from sellers who were represented in the bankruptcy proceedings. They therefore received due process and are bound by the Plan, including its releases, and its res judicata effect. The confirmed Plan properly authorized post-confirmation acts to implement its terms and released liability for those acts. So we will affirm.